## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF SOUTH CAROLINA

| | | |
|---|---|---|
| Charles David Costello, | ) | C/A No.: 1:17-2430-SVH |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | ORDER |
| Nancy A. Berryhill, Acting | ) | |
| Commissioner of Social Security | ) | |
| Administration, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

This appeal from a denial of social security benefits is before the court for a final order pursuant to 28 U.S.C. § 636(c), Local Civ. Rule 73.01(B) (D.S.C.), and the order of the Honorable Donald C. Coggins, Jr., United States District Judge, dated February 12, 2018. [ECF No. 11]. The parties consented to the undersigned United States Magistrate Judge's disposition of this case, with any appeal directly to the Fourth Circuit Court of Appeals. [ECF No. 10].

Plaintiff files this appeal pursuant to 42 U.S.C. § 405(g) of the Social Security Act ("the Act") to obtain judicial review of the final decision of the Commissioner of Social Security ("Commissioner") denying the claim for disability insurance benefits ("DIB"). The two issues before the court are whether the Commissioner's findings of fact are supported by substantial evidence and whether she applied the proper legal standards. For the reasons

that follow, the court remands the Commissioner's decision for further proceedings as set forth herein.

I.      Relevant Background

        A.      Procedural History

On July 14, 2014, Plaintiff protectively filed an application for DIB in which he alleged his disability began on October 21, 2013. Tr. at 75 and 168–69. His application was denied initially and upon reconsideration. Tr. at 98–101 and 106–11. On April 19, 2017, Plaintiff had a hearing before Administrative Law Judge ("ALJ") John T. Molleur. Tr. at 38–59 (Hr'g Tr.). The ALJ issued an unfavorable decision on May 24, 2017, finding that Plaintiff was not disabled within the meaning of the Act. Tr. at 17–37. Subsequently, the Appeals Council denied Plaintiff's request for review, making the ALJ's decision the final decision of the Commissioner for purposes of judicial review. Tr. at 1–5. Thereafter, Plaintiff brought this action seeking judicial review of the Commissioner's decision in a complaint filed on September 12, 2017. [ECF No. 1].

        B.      Plaintiff's Background and Medical History

                1.      Background

Plaintiff was 50 years old at the time of the hearing. Tr. at 42. He obtained a bachelor's degree. Tr. at 44. His past relevant work ("PRW") was

as a merchandise driver. Tr. at 55. He alleges he has been unable to work since October 21, 2013. Tr. at 42.

2.    Medical History

Plaintiff underwent resection of a pineal tumor in 2001 and subsequent shunt placement and revisions in 2001, 2006, and 2008. Tr. at 275.

On October 21, 2013, a computed tomography ("CT") scan showed enlargement of the pineal mass in comparison to previous studies. Tr. at 1124.

On October 23, 2013, Plaintiff presented to Michael Cho, M.D. ("Dr. Cho"), with complaints of eye strain and posterior neck pain. Tr. at 1122. Dr. Cho referred Plaintiff for magnetic resonance imaging ("MRI") of the brain. Tr. at 1123.

Plaintiff continued to report binocular vision dysfunction on October 31, 2013. Tr. at 1116. Dr. Cho indicated the MRI showed slight enlargement of the mass and an area of enhancement, as well as slightly increased edema in the cerebellar vermian region. *Id.* He assessed obstructive hydrocephalus, prescribed Dexamethasone and Pepcid, and referred Plaintiff to an ophthalmologist. *Id.* He indicated Plaintiff might require decompression if his symptoms failed to respond to medication. *Id.*

On December 10, 2013, Plaintiff reported improved vision, but continued to complain of drainage from his left ear, intermittent headaches,

and visual problems. Tr. at 1113. Dr. Cho stated Plaintiff's symptoms were likely caused by tumor enlargement. *Id.* He indicated Plaintiff's symptoms were "not terrible," but likely prevented him from working. Tr. at 1114. He referred Plaintiff to Manoj Abraham, M.D. ("Dr. Abraham"), for evaluation of left ear discharge. *Id.*

In January 2014, Plaintiff developed worsening memory, a cough while eating, and mild unsteadiness. Tr. at 297. He presented to Donato Pacione, M.D. ("Dr. Pacione"), on February 7, 2014, for further evaluation of the pineal tumor. Tr. at 1282. Dr. Pacione noted upward gaze palsy and limited bilateral nasal gaze, but indicated Plaintiff was able to recall three of three items after five minutes and follow complex commands. *Id.* He recommended surgery and explained its risks. Tr. at 1283. Plaintiff opted to proceed with surgery. *Id.*

Plaintiff presented to Chris Morrison, Ph.D. ("Dr. Morrison"), for a neuropsychological consultation as part of a preoperative workup on February 20, 2014. Tr. at 275. Dr. Morrison observed Plaintiff to have specific deficits in verbal production, accurate perception and reproduction of spatial relationships, and consistent attentional engagement. Tr. at 278. He indicated Plaintiff's processing speed was "particularly slowed under higher cognitive demands." *Id.* He noted Plaintiff's verbal and visual memory were on the low end of the average range. *Id.* He stated Plaintiff had normal capacity for abstract reasoning and knowledge of facts and word meanings.

*Id.* He indicated Plaintiff had "somewhat limited" awareness of his deficits. *Id.* He stated it was possible that Plaintiff's cognitive deficits might improve following lesion resection. *Id.*

Plaintiff was admitted to New York University Hospital for surgical resection of a pineal mass on February 24, 2014. Tr. at 297. On February 25, 2014, he underwent left-sided occipital craniotomy for an occipital transtentorial approach to resection of the tumor. Tr. at 311. He participated in postoperative occupational and physical therapy. Tr. at 298. A final pathology report revealed that the tumor was a pilocystic astrocytoma. Tr. at 411. On February 28, 2014, Dr. Pacione indicated that Plaintiff would be unable to return to work for at least three months. Tr. at 1106. Plaintiff was discharged to a rehabilitation facility on March 3, 2014. Tr. at 297.

Plaintiff underwent inpatient rehabilitation from March 3 through March 14, 2014. Tr. at 411. He participated in three hours of occupational and physical therapy each day. Tr. at 422–23. Jaime Levine, D.O. ("Dr. Levine"), noted that Plaintiff made significant gains in the areas of functional mobility, endurance, balance, cognition, memory, vision, safety awareness, and activities of daily living ("ADLs")/self-care independence. *Id.* At the time of discharge, Plaintiff was able to recall two of three objects after one- and five-minute delays and had right homonymous hemianopsia, but no other

neurological deficits. Tr. at 412. Dr. Levine discharged Plaintiff to his home with family supervision and home services. Tr. at 413.

On March 19, 2014, physical therapist John Gillinder, MSPT ("Mr. Gillinder"), noted that Plaintiff was experiencing short-term memory loss that necessitated use of written exercises and repetitive demonstration. Tr. at 1172. Occupational therapist Laura McCabe, OTR ("Ms. McCabe"), indicated Plaintiff's short-term memory limitations and visual field cuts would present barriers to learning. Tr. at 1195.

That same day, Plaintiff presented to Christopher T. Whipple, MS ("Mr. Whipple"), for a cognitive-communicative examination. Tr. at 1211. Mr. Whipple noted mild-to-moderate cognitive-linguistic deficits characterized by impaired word retrieval and immediate, short-term, and prospective memory deficits. *Id.* He indicated Plaintiff was motivated to improve his cognitive functioning and was using strategies for memory recall with repetition and cueing. *Id.* He recommended that Plaintiff continue to use memory techniques and cognitive-based applications on a computer tablet. *Id.* Mr. Whipple assessed Plaintiff as having a mild reduction in speaking efficiency, requiring extra time with cueing, and demonstrating 60 percent accuracy. *Id.* He stated Plaintiff's goal was to improve to 90 percent accuracy and only mild reduction in efficiency and extra time required without cueing within one month. *Id.* He indicated Plaintiff required moderate cueing with new learning

and additional effort without cueing and had 75 percent memory accuracy. Tr. at 1212. He noted that Plaintiff was unable to reliably process multi-step instructions without repetition or writing down key words and had trouble recalling errands and tasks without a to-do list and occasional reminders. *Id.*

On March 24, 2014, Mohammad Fouladvand, M.D. ("Dr. Fouladvand"), observed right hemi-field defect and dense right homonymous hemianopsia with sparing in the central macular area. Tr. at 1074. He recommended occupational and vision therapy to improve depth perception and field defect. Tr. at 1163.

That same day, Plaintiff followed up with Dr. Pacione. Tr. at 1168. He reported that he had been doing well and that his vision was improving. *Id.* Dr. Pacione described Plaintiff as being awake, oriented times three, and able to follow complex commands. *Id.*

On April 8, 2014, Plaintiff followed up with his primary care physician, Michael Gaesser, M.D. ("Dr. Gaesser"), regarding hypertension and hyperlipidemia. Tr. at 1249. He reported transient weakness, visual disturbance, muscular weakness, incoordination, and memory difficulties. Tr. at 1250. Dr. Gaesser instructed Plaintiff to continue to take his medications, to reduce his caloric intake, and to maintain a low-salt diet. Tr. at 1251.

Mr. Whipple discharged Plaintiff from speech and language therapy on May 2, 2014, after he demonstrated good ability to use reminders and

organization-based applications, functional memory skills for rehearsal and retrieval of functional information, and the ability to carry out techniques to increase his memory and attention skills on his own. Tr. at 1218–19. Mr. Whipple noted that Plaintiff continued to have mild cognitive-linguistic deficits characterized by impaired immediate and prospective memory and occasional difficulty with word retrieval. Tr. at 1221. He indicated Plaintiff spoke with 90 percent accuracy and had only a mild reduction in efficiency or extra time required without cueing. *Id.* He stated Plaintiff's memory was 75 percent accurate; that he required additional effort with cueing for new learning; and that he was independent with strategies for lengthy and complex information in routine situations. *Id.* He indicated Plaintiff "[d]emonstrate[d] adequate memory/reasoning/judgment to perform most activities in a supervised environment." *Id.*

On June 23, 2014, Dr. Pacione noted that Plaintiff had completed his outpatient rehabilitation program. Tr. at 1169. He stated Plaintiff's field cut had improved, his eye movement had normalized, and his vision had improved, but remained blurry. *Id.* He described Plaintiff as being awake, alert, oriented times three, and able to follow complex commands. *Id.* He indicated an MRI showed no evidence of residual or recurrent tumor. *Id.*

Plaintiff returned to Mr. Whipple for additional therapy. Tr. at 1222. On August 19, 2014, Mr. Whipple noted that Plaintiff's memory was at least

one percent, but less than 20 percent impaired. *Id.* He stated Plaintiff was able to recall or use external aids and strategies for complex information and planning complex future events. *Id.* He noted that Plaintiff occasionally required minimal cues when he experienced breakdowns in the use of memory strategies and that the breakdowns might occasionally interfere with his functioning in vocational and other activities. *Id.*

On September 8, 2014, Dr. Pacione observed Plaintiff to be awake, alert, oriented times three, and able to follow complex commands. Tr. at 1276. He indicated an MRI of Plaintiff's brain showed stable postsurgical changes and no new areas of enhancement to suggest recurrence. *Id.* He reprogrammed Plaintiff's shunt and instructed him to follow up for a new MRI in six months. *Id.*

Later that day, Plaintiff reported improved vision and eye movement and denied headaches and diplopia. Tr. at 1269. Dr. Fouladvand observed Plaintiff to have intact speech, language, memory, and general knowledge. Tr. at 1271. He stated Plaintiff had no papilledema, improved eye movement, nearly normal vertical and horizontal gaze, and no diplopia in primary or lateral gaze. *Id.* He indicated Plaintiff continued to have right homonymous hemianopia. *Id.*

Plaintiff followed up with Dr. Morrison for a postoperative neuropsychological consultation on September 11, 2014. Tr. at 280. He

reported short-term memory problems, poor judgment, poor problem solving/reasoning, and visual impairment. *Id.* He stated he had noticed a "shorter temper," had felt less patient and more disinhibited, and had been saying inappropriate things. *Id.* Dr. Morrison noted that Plaintiff laughed often and inappropriately; had an affect that was inappropriate or incongruent to the situation at times; was very talkative and perseverative; appeared anxious; and acted disinhibited and impulsive at times. Tr. at 281. In attention and processing speed testing, Dr. Morrison observed Plaintiff to have borderline impaired digit span, low average visual search and attention, normal visual scanning, average five-digit working memory, and superior eight-digit sequencing ability. Tr. at 282. Plaintiff's ability to perform executive functions of set shifting, problem solving, and planning were intact, but he remained very slow on select verbal initiation tasks. *Id.* His ability to retrieve words was weak and unchanged from preoperative testing. *Id.* His visuoperception and visuoconstructive abilities remained poor. *Id.* His visual memory was in the low-average range, but he did better when verbal information was presented with structure. *Id.* Plaintiff denied significant symptoms of affective distress, but Dr. Morrison observed mild dysphoria to be present. Tr. at 283. Dr. Morrison stated the following:

> Mr. Costello's intact performance on most higher-order cognitive measures in our well-controlled testing environment suggests the potential for job success in the future, as well as the possibility of additional cognitive gains. However, his job success in the future

will depend on the level of structure and routine offered by the
work setting.

Tr. at 283. He stated Plaintiff may benefit from structure and reminders. Tr.
at 284. He advised Plaintiff to participate in cognitive rehabilitation exercises
as directed and to consider joining a support group. *Id.*

Plaintiff presented to Merhi Eye Clinic on October 31, 2014. Tr. at
1303. He complained of visual field loss and unstable visual acuity. Tr. at
1304. He indicated he had a driver's license, but had chosen not to drive
during the prior year. *Id.* Plaintiff's visual acuity was 20/25 in both eyes with
best correction. Tr. at 1306. His near visual acuity was 20/30. *Id.* His
confrontation visual field was abnormal. *Id.* Eva Merhi, O.D. ("Dr. Merhi"),
assessed visual field defect/homonymous hemianopsia on the right. Tr. at
1307. She stated Plaintiff's "fluctuating visual acuities & transient diplopia"
made him "a poor candidate for employment" at that time. *Id.*

State agency medical consultant Katrina B. Doig, M.D. ("Dr. Doig"),
reviewed the record and completed a physical residual functional capacity
("RFC") assessment on November 24, 2014. Tr. at 68–71. She indicated
Plaintiff was limited as follows: occasionally lifting and/or carrying 50
pounds; frequently lifting and/or carrying 25 pounds; standing and/or
walking for about six hours in an eight-hour workday; sitting for about six
hours in an eight-hour workday; occasionally climbing ramps and stairs;
never climbing ladders, ropes, or scaffolds; and avoiding even moderate

11

exposure to hazards and unprotected heights. *Id.* A second state agency medical consultant, Stephen Burge, M.D. ("Dr. Burge"), assessed a similar physical RFC on May 22, 2015, but found that Plaintiff could occasionally climb ladders, ropes, and scaffolds. Tr. at 94.

On November 25, 2014, state agency psychological consultant Kendra Werden, Ph.D. ("Dr. Werden"), reviewed the evidence and completed a psychiatric review technique ("PRT"). Tr. at 66–67. She considered Listings 12.02 for organic mental disorders and 12.06 for anxiety-related disorders and found that Plaintiff had no episodes of decompensation, mild restriction of activities of daily living ("ADLs"), moderate difficulties in maintaining social functioning, and moderate difficulties in maintaining concentration, persistence, or pace. *Id.* Dr. Werden prepared a mental RFC assessment. Tr. at 71–73. She stated Plaintiff was moderately limited in his abilities to understand and remember detailed instructions; to work in coordination with or proximity to others without being distracted by them; to interact appropriately with the general public; and to get along with coworkers or peers without distracting them or exhibiting behavioral extremes. *Id.* She stated the following:

> Due to symptoms from mental impairments addressed in the SSA 2506, the claimant would be expected to have difficulty understanding, remembering, and carrying out detailed instructions. He is capable of performing simple tasks for at least two hour periods of time. He would be expected to occasionally miss a day of work secondary to his symptoms. He is expected to

have difficulty working in close proximity or coordination with co-workers. He would be best suited for a job which does not require continuous interaction with the general public. He is capable of single, repetitive tasks without special supervision. He can attend work regularly and accept supervisory feedback. He would be best suited for work environments that he can receive verbal instructions with visual cues when learning a new task.

Tr. at 72.

Plaintiff presented to Edward R. McCarthy, M.D. ("Dr. McCarthy"), to establish care on December 2, 2014. Tr. at 1320. He reported difficulty with memory, word retrieval, and right field vision cuts. *Id.* Dr. McCarthy noted no abnormalities on physical examination. Tr. at 1321–22.

Plaintiff presented to Timothy W. Loebs, MA, LPC ("Mr. Loebs"), for counseling sessions on December 9, 16, 23, and 30, 2014; January 13, 2015; February 3 and 17, 2014; March 3, 17, and 31, 2015; April 14 and 28, 2015; May 19 and 26, 2015; June 2, 9, and 16, 2015; July 9, 21, and 25 2015; August 18, 2015; and November 16, 2015.[1] Tr. at 1338–47. Mr. Loebs described Plaintiff as having a flat affect and some anxiety. *Id.* Plaintiff reported anger, relationship stressors, and memory problems. *Id.* He engaged in exercises to improve his memory and cope with stress. *Id.*

On May 8, 2015, Plaintiff complained of intermittent tremors in his bilateral pinkies and cognitive slowing. Tr. at 1329. Jeff A. Benjamin, D.O. ("Dr. Benjamin"), reviewed prior MRIs of Plaintiff's brain that showed severe

---

[1] Mr. Loebs's notes are difficult to read because they are faint and handwritten. *See* Tr. at 1338–47.

white matter changes. Tr. at 1330. He observed Plaintiff to be oriented to person, place, and time; to demonstrate fluent speech; to have no evidence of cortical defects; and to be a "little bit slow" from a cognitive perspective. *Id.* He stated tremors were not evident during the exam and that Plaintiff exhibited no features of Parkinson's disease. *Id.* He encouraged Plaintiff to start Aricept for cognitive changes, but Plaintiff declined to do so. *Id.* He instructed Plaintiff to take omega vitamins. *Id.*

Plaintiff presented to Douglas Ritz, Ph.D. ("Dr. Ritz"), for a consultative mental status examination on June 10, 2015. Tr. at 1325. He reported problems with short-term memory, prolonged mental processing, difficulty with word finding, slowed calculation ability, and difficulty maintaining concentration. *Id.* He stated he felt more angry and acted out verbally more often than he had prior to his most recent brain surgery. *Id.* He endorsed hand tremor, ringing in the ears, and right field vision cuts. *Id.* Dr. Ritz observed that Plaintiff was oriented to time, place, and person, but was unable to recall the complete address to the office. Tr. at 1327. He stated Plaintiff was able to recall one of three words after a few minutes. *Id.* He indicated Plaintiff was able to perform serial sevens "quite easily" and could repeat a nine-word sentence and point to figures in a directed order. *Id.* Plaintiff obtained 27 of 30 points on the Mini-Mental State Examination ("MMSE"), which Dr. Ritz considered to be in the unimpaired range. *Id.* Dr.

Ritz assessed Plaintiff's cognitive skills as average. *Id.* He stated Plaintiff had described difficulties that were consistent with mild neurocognitive disorder, but that he could not obtain sufficient evidence from testing to confirm that diagnosis. *Id.* He noted that Plaintiff was able to consistently care for his personal grooming, perform chores slowly, interact socially, avoid physical danger, and handle funds. *Id.* He opined that Plaintiff was able to "handle an unskilled work setting." *Id.*

On July 8, 2015, a second state agency psychological consultant, Lee Coleman, Ph.D. ("Dr. Coleman"), completed a PRT. Tr. at 89–90. He considered Listing 12.05 and found that Plaintiff had no episodes of decompensation, mild restriction of ADLs, mild difficulties in maintaining social functioning, and mild difficulties in maintaining concentration, persistence, or pace. *Id.* He determined that Plaintiff had mental symptoms, but that his limitations did not preclude work-related activities. Tr. at 90.

On September 30, 2015, Plaintiff indicated that he was doing well from a cognitive perspective. Tr. at 1332. He reported visual problems and indicated his tremors were unchanged. *Id.* He expressed a desire to resume driving. *Id.* Dr. Benjamin stated he could not restrict Plaintiff from operating a motor vehicle, but that it was ultimately up to his eye doctors. Tr. at 1333.

On April 13, 2016, an MRI of Plaintiff's brain showed stable postoperative changes and unchanged pattern of signal abnormality and

enhancement in the region of the tumor. Tr. at 1356. David Goltra, M.D. ("Dr. Goltra"), noted a pattern of diffuse dural enhancement and partial collapse of the right lateral ventricular system that might suggest an overshunting phenomena. *Id.*

On April 14, 2016, Joseph T. Cheatle, M.D. ("Dr. Cheatle"), reprogrammed Plaintiff's shunt and instructed him to follow up for another MRI in 18 months. Tr. at 1359.

On October 20, 2016, Plaintiff denied changes to his memory. Tr. at 1360. Dr. Benjamin noted slowed cognition on physical examination. Tr. at 1361. He observed no abnormalities on neurological examination and stated Plaintiff had intact orientation, fluent speech, appropriate mood, and good attention/recall. Tr. at 1361. He assessed memory loss from multiple traumas to the brain and prescribed Namenda. Tr. at 1362.

Plaintiff presented to Carl F. Sloan, M.D. ("Dr. Sloan"), for a visual examination on December 22, 2016. Tr. at 1363–67. Visual field testing revealed a right-sided defect in both eyes. Tr. at 1366. Plaintiff's vision was stable as compared to October 2015. Tr. at 1367. Dr. Sloan stated no treatment was indicated. *Id.*

On February 23, 2017, Plaintiff presented to George Sandoz, M.D. ("Dr. Sandoz"), with complaints of bilateral vision problems, memory problems, traumatic brain injury, and tremors. Tr. at 1399. He reported dizziness. Tr.

at 1400. Dr. Sandoz observed Plaintiff to be oriented to person, to have appropriate mood/affect, to be able to appropriately name objects, to have intact recent memory, and to have a fund of knowledge for current events. *Id.*

Plaintiff reported to Robert Jansen, M.D. ("Dr. Jansen"), on April 7, 2017, to discuss the results of a prostate ultrasound and needle biopsy. Tr. at 1413. Dr. Jansen informed Plaintiff that the testing was positive for adenocarcinoma of the prostate. Tr. at 1415. He informed Plaintiff of the various treatment options, and Plaintiff indicated a desire to proceed with surgery. Tr. at 1413–15.

C.    The Administrative Proceedings

1.    The Administrative Hearing

a.    Plaintiff's Testimony

At the hearing on April 19, 2017, Plaintiff testified that he lived alone. Tr. at 43. He indicated he had recently been diagnosed with prostate cancer, but had not yet started treatment. Tr. at 45.

Plaintiff testified that he had been a driver for most of his career. *Id.* He indicated that after his brain tumor returned in 2013, his neurosurgeon declined to authorize him to drive a commercial vehicle. *Id.* He stated he was subsequently cleared to drive a regular motor vehicle. *Id.*

Plaintiff testified that his brain tumor had caused him to lose peripheral vision and to experience tremors. Tr. at 48. He indicated he had

problems with his memory. *Id.* He stated he had difficulty sitting through an entire football or baseball game. Tr. at 51. He indicated he likely lacked the ability to sit and focus on something for two hours without a break. Tr. at 52. He endorsed sleep disturbance and mood swings. Tr. at 50.

b.      Vocational Expert Testimony

Vocational Expert ("VE") Arthur Schmitt, Ph.D., reviewed the record and testified at the hearing. Tr. at 54–58. The VE categorized Plaintiff's PRW as a merchandise driver, *Dictionary of Occupational Titles* ("*DOT*") number 292.353-010, as requiring medium exertion and having a specific vocational preparation ("SVP") of three. Tr. at 55. The ALJ described a hypothetical individual of Plaintiff's vocational profile who could perform work at the medium exertional level with the following additional restrictions: no climbing of ladders, ropes, or scaffolds; occasionally climbing ramps and stairs; no operation of a motorized vehicle; no close proximity to mobile machinery; no work at unprotected heights; no more than occasional and basic decision making or changes in work setting; no exposure to hazards; and no work that requires scanning a wide visual field. Tr. at 55–56. The VE testified that the hypothetical individual would be unable to perform Plaintiff's PRW. Tr. at 56. The ALJ asked whether there were any other jobs that the hypothetical person could perform. *Id.* The VE identified medium jobs with an SVP of two as a packer, *DOT* number 920.687-134, with 19,008

positions in the state economy and 360,000 positions in the national economy; a janitor, *DOT* number 381.687-018, with 72,600 positions in the state economy and 2,900,000 positions in the national economy; and a laundry operator, *DOT* number 361.685-014, with 3,190 positions in the state economy and 211,000 positions in the national economy. *Id.*

The ALJ asked the VE to consider an individual who was limited to light work with the additional restrictions presented in the prior question. *Id.* He asked if there would be other jobs that the individual would be able to perform. *Id.* The VE identified light jobs with an SVP of two as a storage facility clerk, *DOT* number 295.367-026, with 4,400 positions in the state economy and 416,000 positions in the national economy; a ticket taker, *DOT* number 344.687-010, with 1,250 positions in the state economy and 104,000 positions in the national economy; and a coupon-redemption clerk, *DOT* number 290.477-010, with 200 positions in the state economy and 14,700 positions in the national economy. Tr. at 56–57.

The ALJ next asked the VE to consider that the individual would be limited to work requiring no more than occasional and basic decision making or changes in the work setting. Tr. at 57. He questioned whether this restriction would limit the individual to unskilled work. *Id.* The VE confirmed that it would. *Id.*

The ALJ asked the VE to consider the restrictions in the second hypothetical question, but to further consider that, as a result of difficulties with memory, the individual would require remediation approximately once a month. *Id.* The VE indicated the individual would be able to perform the jobs identified in response to the second question. *Id.*

The ALJ asked the VE to consider that, as result of memory lapses, the individual would be 15 to 20 percent slower than the average worker. Tr. at 57–58. He questioned whether the individual would be able to sustain unskilled work. Tr. at 58. The VE stated that the individual would be unemployable. *Id.*

The ALJ asked the VE to consider that the individual would be off task for 60 to 90 minutes per day, in addition to scheduled breaks. *Id.* He questioned whether the individual would be able to sustain competitive employment. *Id.* The VE testified that the individual would be unemployable. *Id.*

2.    The ALJ's Findings

In his decision dated May 24, 2017, the ALJ made the following findings of fact and conclusions of law:

1.    The claimant meets the insured status requirements of the Social Security Act through June 30, 2019.
2.    The claimant has not engaged in substantial gainful activity since October 21, 2013, the alleged onset date (20 CFR 404.1571 *et seq.*).

3. The claimant has the following severe impairments: neurocognitive disorders and visual field loss status-post recurrent pineal brain tumor resections (20 CFR 404.1520(c)).

4. The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525 and 404.1526).

5. After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform less than a full range of medium work as defined in 20 CFR 404.1567(c). Medium exertional work is described by the Commissioner of the Social Security Administration as requiring lifting/carrying of up to 50 pounds occasionally and 25 pounds frequently as well as standing, walking, and sitting for 6 hours in an 8-hour workday. The claimant can never climb ladders, ropes, or scaffolds, but can occasionally climb ramps and stairs. He must have no requirement to operate a motorized vehicle, no close proximity to mobile machinery, no work at unprotected heights, and no requirement to scan a wide visual field using peripheral vision. He is capable of no more than occasional and basic decision-making or changes in the work setting.

6. The claimant is unable to perform any past relevant work (20 CFR 404.1565).

7. The claimant was born on January 4, 1967 and was 46 years old, which is defined as a younger individual age 18–49, on the alleged disability onset date. The claimant subsequently changed age category to closely approaching advanced age (20 CFR 404.1563).

8. The claimant has at least a high school education and is able to communicate in English (20 CFR 404.1564).

9. Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569 and 404.1569(a)).

11. The claimant has not been under a disability, as defined in the Social Security Act, from October 21, 2013, through the date of this decision (20 CFR 404.1520(g)).

Tr. at 22–31.

II.    Discussion

Plaintiff alleges the Commissioner erred in failing to sufficiently account for his moderate difficulties in concentration, persistence, or pace. The Commissioner counters that substantial evidence supports the ALJ's findings and that the ALJ committed no legal error in his decision.

A.    Legal Framework

1.    The Commissioner's Determination-of-Disability Process

The Act provides that disability benefits shall be available to those persons insured for benefits, who are not of retirement age, who properly apply, and who are under a "disability." 42 U.S.C. § 423(a). Section 423(d)(1)(A) defines disability as:

> the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for at least 12 consecutive months.

42 U.S.C. § 423(d)(1)(A).

To facilitate a uniform and efficient processing of disability claims, regulations promulgated under the Act have reduced the statutory definition of disability to a series of five sequential questions. *See, e.g., Heckler v. Campbell*, 461 U.S. 458, 460 (1983) (discussing considerations and noting "need for efficiency" in considering disability claims). An examiner must

consider the following: (1) whether the claimant is engaged in substantial gainful activity; (2) whether he has a severe impairment; (3) whether that impairment meets or equals an impairment included in the Listings;[2] (4) whether such impairment prevents claimant from performing PRW;[3] and (5) whether the impairment prevents him from doing substantial gainful employment. *See* 20 C.F.R. § 404.1520. These considerations are sometimes referred to as the "five steps" of the Commissioner's disability analysis. If a decision regarding disability may be made at any step, no further inquiry is necessary. 20 C.F.R. § 404.1520(a)(4) (providing that if Commissioner can find claimant disabled or not disabled at a step, Commissioner makes determination and does not go on to the next step).

---

[2] The Commissioner's regulations include an extensive list of impairments ("the Listings" or "Listed impairments") the Agency considers disabling without the need to assess whether there are any jobs a claimant could do. The Agency considers the Listed impairments, found at 20 C.F.R. part 404, subpart P, Appendix 1, severe enough to prevent all gainful activity. 20 C.F.R. § 404.1525. If the medical evidence shows a claimant meets or equals all criteria of any of the Listed impairments for at least one year, he will be found disabled without further assessment. 20 C.F.R. § 404.1520(a)(4)(iii). To meet or equal one of these Listings, the claimant must establish that his impairments match several specific criteria or are "at least equal in severity and duration to [those] criteria." 20 C.F.R. § 404.1526; *Sullivan v. Zebley*, 493 U.S. 521, 530 (1990); *see Bowen v. Yuckert*, 482 U.S. 137, 146 (1987) (noting the burden is on claimant to establish his impairment is disabling at Step 3).

[3] In the event the examiner does not find a claimant disabled at the third step and does not have sufficient information about the claimant's past relevant work to make a finding at the fourth step, he may proceed to the fifth step of the sequential evaluation process pursuant to 20 C.F.R. § 404.1520(h).

A claimant is not disabled within the meaning of the Act if he can return to PRW as it is customarily performed in the economy or as the claimant actually performed the work. *See* 20 C.F.R. Subpart P, § 404.1520(a), (b); Social Security Ruling ("SSR") 82-62 (1982). The claimant bears the burden of establishing his inability to work within the meaning of the Act. 42 U.S.C. § 423(d)(5).

Once an individual has made a prima facie showing of disability by establishing the inability to return to PRW, the burden shifts to the Commissioner to come forward with evidence that claimant can perform alternative work and that such work exists in the regional economy. To satisfy that burden, the Commissioner may obtain testimony from a VE demonstrating the existence of jobs available in the national economy that claimant can perform despite the existence of impairments that prevent the return to PRW. *Walls v. Barnhart*, 296 F.3d 287, 290 (4th Cir. 2002). If the Commissioner satisfies that burden, the claimant must then establish that he is unable to perform other work. *Hall v. Harris*, 658 F.2d 260, 264–65 (4th Cir. 1981); *see generally Bowen v. Yuckert*, 482 U.S. 137, 146. n.5 (1987) (regarding burdens of proof).

2.     The Court's Standard of Review

The Act permits a claimant to obtain judicial review of "any final decision of the Commissioner [] made after a hearing to which he was a

party." 42 U.S.C. § 405(g). The scope of that federal court review is narrowly-tailored to determine whether the findings of the Commissioner are supported by substantial evidence and whether the Commissioner applied the proper legal standard in evaluating the claimant's case. *See id.*, *Richardson v. Perales*, 402 U.S. 389, 390 (1971); *Walls v. Barnhart*, 296 F.3d 287, 290 (4th Cir. 2002) (*citing Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990)).

The court's function is not to "try these cases de novo or resolve mere conflicts in the evidence." *Vitek v. Finch*, 438 F.2d 1157, 1157–58 (4th Cir. 1971); *see Pyles v. Bowen*, 849 F.2d 846, 848 (4th Cir. 1988) (*citing Smith v. Schweiker*, 795 F.2d 343, 345 (4th Cir. 1986)). Rather, the court must uphold the Commissioner's decision if it is supported by substantial evidence. "Substantial evidence" is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson*, 402 U.S. at 390, 401; *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005). Thus, the court must carefully scrutinize the entire record to assure there is a sound foundation for the Commissioner's findings and that her conclusion is rational. *See Vitek*, 438 F.2d at 1157–58; *see also Thomas v. Celebrezze*, 331 F.2d 541, 543 (4th Cir. 1964). If there is substantial evidence to support the decision of the Commissioner, that decision must be affirmed "even should

the court disagree with such decision." *Blalock v. Richardson*, 483 F.2d 773, 775 (4th Cir. 1972).

B.    Analysis

Plaintiff argues that the ALJ failed to adequately account for his moderate difficulties in concentration, persistence, or pace in the RFC assessment. [ECF No. 9 at 6]. He maintains the ALJ did not consider his ability to remain on task. *Id.* at 6–7. He contends the restrictions in the RFC assessment do not address his ability "'to sustain focused attention and concentration sufficiently long to permit the timely and appropriate completion of tasks found in a work setting' as required under Listing 12.00." [ECF No. 13 at 2].

The Commissioner argues that the RFC assessment fully accounted for all of Plaintiff's credibly-established limitations and that the ALJ articulated reasoning that was sufficient to allow for judicial review. [ECF No. 12 at 5–2]. She maintains the ALJ thoroughly discussed relevant evidence regarding Plaintiff's ability to maintain concentration, persistence, or pace. *Id.* at 10–14. She contends the ALJ did not simply limit Plaintiff to unskilled work, but included restrictions for no more than occasional basic decision making and no more than occasional changes in the work setting. *Id.* at 15, citing Tr. at 25. She claims that the record failed to demonstrate that Plaintiff lacked the ability to stay on task throughout an eight-hour workday. *Id.* at 17.

A claimant's RFC represents the most he can still do despite his limitations. 20 C.F.R. § 404.1545(a). It must be based on all the relevant evidence in the case record and should account for all of the claimant's medically-determinable impairments. *Id.* The RFC assessment must include a narrative discussion describing how all the relevant evidence in the case record supports each conclusion and must cite "specific medical facts (e.g., laboratory findings) and non-medical evidence (e.g., daily activities, observations)." SSR 96-8p, 1996 WL 374184 at *7 (1996). The ALJ must determine the claimant's ability to perform work-related physical and mental abilities on a regular and continuing basis. *Id.* at *2. He must explain how any material inconsistencies or ambiguities in the record were resolved. *Id.* at *7. "[R]emand may be appropriate . . . where an ALJ fails to assess a claimant's capacity to perform relevant functions, despite contradictory evidence in the record, or where other inadequacies in the ALJ's analysis frustrate meaningful review." *Mascio v. Colvin*, 780 F.3d 632, 636 (4th Cir. 2015), citing *Cichocki v. Astrue*, 729 F.3d 172, 177 (2d Cir. 2013).

In *Mascio*, 780 F.3d at 638, the court found that the ALJ erred in assessing the plaintiff's RFC. *Id.* It stated "we agree with other circuits that an ALJ does not account 'for a claimant's limitations in concentration, persistence, and pace by restricting the hypothetical question to simple, routine tasks or unskilled work.'" *Id.* The court explained that it was possible

for the ALJ to find that the moderate concentration, persistence, or pace limitation did not affect the plaintiff's ability to work, but that remand was required "because the ALJ here gave no explanation." *Id.* This court has interpreted the Fourth Circuit's holding in *Mascio* to emphasize that an ALJ must explain how he considered the claimant's limitation in concentration, persistence, or pace in assessing his RFC. *See Sipple v. Colvin*, No. 8:15-1961-MBS-JDA, 2016 WL 4414841, at *9 (D.S.C. Jul. 29, 2016), adopted by 2016 WL 4379555 (D.S.C. Aug. 17, 2016) ("After *Mascio*, further explanation and/or consideration is necessary regarding how Plaintiff's moderate limitation in concentration, persistence, or pace does or does not translate into a limitation in his RFC.").

The ALJ provided the following explanation for his assessment of moderate limitations in concentration, persistence, or pace:

> The claimant testified that he had difficulty maintaining concentration/focus. In September 2014, the claimant's wife Sandra Jans, completed a Function Report that indicated that the claimant watched television and participated in fantasy football daily (Exhibit 3E). In January 2015, the claimant's wife completed a Third Party Function Report stating that the claimant was able to use a computer, pay bills, watch television for extended periods, and follow simple written instructions (Exhibit 6E). In January 2015, the claimant's wife completed a Function Report because it was reported that he could not complete paperwork independently due to vision issues. It was reported that the claimant had a shorter attention span, but enjoyed playing memory games, shopped occasionally in stores and online, handled a checkbook and savings account/paid bills, watched television daily, had more difficulty with spoken instructions than written instructions (Exhibit 7E).

Tr. at 24. He included provisions in the RFC assessment for "no more than occasional and basic decision-making or changes in the work setting." Tr. at 25.

Pursuant to Listing 12.00(E)(3), evaluation of a claimant's ability to maintain concentration, persistence, or pace requires examination of his "abilities to focus attention on work activities and stay on task at a sustained rate." "[T]he nature of this area of mental functioning" includes: "initiating and performing a task that you understand and know how to do; working at an appropriate and consistent pace; completing tasks in a timely manner; ignoring or avoiding distractions while working; changing activities or work settings without being disruptive; working close to or with others without interrupting or distracting them; sustaining an ordinary routine and regular attendance at work; and working a full day without needing more than the allotted number or length of rest periods during the day." 20 C.F.R. Pt. 404, Subpt. P, App'x 1 § 12.00(E)(3).

The ALJ's inclusion of provisions for "no more than occasional and basic decision-making or changes in the work setting" addresses some, but not all, components of Plaintiff's ability to maintain concentration, persistence, or pace. *See id.* In September 2014, Dr. Morrison found that Plaintiff remained very slow on verbal initiation tasks and indicated his job success would depend on the level of structure and routine offered by the

work setting. Tr. at 282 and 283. Dr. Werden found that Plaintiff would have difficulty working in close proximity or coordination with coworkers; was capable of single, repetitive tasks without special supervision; and would perform best if provided verbal instructions with visual cues when learning new tasks. Tr. at 72. On May 8, 2015, Dr. Benjamin observed Plaintiff to be a "little bit slow" from a cognitive perspective, and on October 20, 2016, he again noted slowed cognition. Tr. at 1330 and 1361. On June 10, 2015, Dr. Ritz noted that Plaintiff was able to perform chores slowly. Plaintiff testified that he had problems with memory, difficulty sitting through an entire football or baseball game, and likely lacked the ability to focus on a task for two-hour segments without interruption. Tr. at 48, 51, and 52. The foregoing evidence suggests possible impairment in Plaintiff's abilities to work at an appropriate and consistent pace, complete tasks in a timely manner, ignore or avoid distractions while working, and work close to or with others.

The ALJ conceded that Plaintiff needed "a structured work environment," but that his mental health deficits could be adequately addressed by "a work environment that required only occasional/basic decision making." Tr. at 30. He cited evidence to support his finding that Plaintiff's "memory did not appear to be as impaired as alleged." Tr. at 28–30. He noted Dr. Morrison's indication that Plaintiff's job success would depend on the level of structure and routine offered in the work setting and Dr.

Benjamin's findings of cognitive slowing. Tr. at 28. He accorded significant weight to the state agency consultants' opinions, which included Dr. Werden's impressions. Tr. at 29.

Despite the fact that the ALJ credited evidence that suggested possible impairment in Plaintiff's abilities to work at an appropriate and consistent pace, complete tasks in a timely manner, ignore or avoid distractions while working, and work close to or with others, his explanation of the RFC assessment is devoid of restrictions intended to address those potentially-impaired abilities. The ability to perform tasks with "no more than occasional and basic decision-making or changes in the work setting" differs from abilities to "stay on task," complete tasks in a timely manner, perform work without special instructions, and work with distractions. *See Mascio*, 780 F.3d at 638. The ALJ's decision lacks any reason for declining to include additional restrictions that pertain to these abilities. Perhaps the ALJ can explain why Plaintiff's moderate limitation in concentration, persistence, or pace does not cause additional restrictions, but the court cannot find that such a conclusion is supported by substantial evidence in light of the ALJ's failure to reconcile evidence to the contrary. *See id.*

In light of the foregoing, the ALJ's RFC assessment fails to comply with the provisions set forth in SSR 96-8p and the Fourth Circuit's direction in *Mascio*. Consequently, the court finds that substantial evidence does not

support the RFC assessment. "[B]ecause the ALJ here gave no explanation, a remand is in order." *Mascio*, 780 F.3d at 638.

III.     Conclusion

The court's function is not to substitute its own judgment for that of the ALJ, but to determine whether the ALJ's decision is supported as a matter of fact and law. Based on the foregoing, the court cannot determine that the Commissioner's decision is supported by substantial evidence. Therefore, the undersigned reverses and remands this matter for further administrative proceedings pursuant to sentence four of 42 U.S.C. § 405(g).

IT IS SO ORDERED.

*Shiva V. Hodges*

April 30, 2018                                   Shiva V. Hodges
Columbia, South Carolina               United States Magistrate Judge